THOMAS F. LANDERS [SBN 207335]
tlanders@swsslaw.com
L. GEOFFREY LEE [SBN 234024]
glee@swsslaw.com
SOLOMON WARD SEIDENWURM & SMITH, LLP
401 B Street, Suite 1200
San Diego, California 92101
Telephone: (619) 231-0303
Facsimile: (619) 231-4755

Attorneys for Plaintiff JAMES R. HUCK dba
HUMAN RESOURCES INTERNATIONAL

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES R. HUCK dba HUMAN RESOURCES INTERNATIONAL,<br><br>Plaintiff,<br><br>v.<br><br>PFIZER, INC., a Delaware Corporation, DOES 1 through 50, inclusive,<br><br>Defendants. | CASE NO. 08cv 1277 L (WVG)<br><br>FIRST AMENDED COMPLAINT FOR:<br><br>1. BREACH OF CONTRACT;<br>2. FRAUD AND DECEIT—INTENTIONAL MISREPRESENTATION;<br>3. FRAUD AND DECEIT—CONCEALMENT;<br>4. FRAUD AND DECEIT—NEGLIGENT MISREPRESENTATION;<br>5. BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;<br>6. UNJUST ENRICHMENT;<br>7. QUANTUM MERUIT;<br>8. WORK, LABOR, AND SERVICES PROVIDED; AND<br>9. UNFAIR BUSINESS PRACTICES<br><br>AND<br><br>DEMAND FOR JURY TRIAL |

Plaintiff, JAMES R. HUCK dba HUMAN RESOURCES INTERNATIONAL ("Plaintiff"), alleges:

### PARTIES AND JURISDICTION

1. Plaintiff James R. Huck is, and at all relevant times was, a citizen of the State of California and a resident of San Diego, California. Plaintiff James R. Huck does business under the fictitious business name Human Resources International ("HRI").

2.      Plaintiff is informed and believes that Defendant Pfizer, Inc. ("Defendant") is, and at all relevant times was, a Corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York.  Plaintiff is informed and believes that at all relevant times Defendant Pfizer did business within the State of California and within this judicial district.  Plaintiff is further informed and believes that at all relevant times Defendant did business using the names Pfizer Global Pharmaceuticals ("PGP"), Pfizer Pharmaceutical Group ("PPG"), and Worldwide Pharmaceutical Organization ("WPO").

3.      Plaintiff is ignorant of the true names or capacities of Defendants sued herein as Does 1 through 50 and therefore sues these Defendants by such fictitious names.  Plaintiff will amend this Complaint to allege the true names and capacities of these Defendants when they are ascertained.  Plaintiff is informed and believes and based herein alleges that such Defendants are liable, along with other named Defendants, for the damages alleged herein.

4.      On information and belief, Plaintiff alleges that all times relevant to this Complaint, each of the Defendants named herein (including, without limitation, Does 1 through 50) was an agent, partner, officer, parent, subsidiary, member, fiduciary, co-conspirator or employee of each of the other Defendants, and was acting within the course and scope of said agency, partnership, conspiracy, or employment in doing the things complained of herein.

5.      This action is not subject to the provisions of California Civil Code Sections 2981 *et seq.*, or 1801.

6.      Venue is proper in this court because:  (1) A substantial portion of the acts complained of herein occurred within the geographical boundaries of this Court's jurisdiction;(2) Plaintiff resides, and was injured, within the geographical boundaries of this Court's jurisdiction; and (3) The agreements at issue were negotiated, entered into, and were partially performed within the geographical boundaries of this Court's jurisdiction.

### ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

7.      Plaintiff James R. Huck holds a Ph.D. in organizational psychology.  Through

HRI, Dr. Huck provides consulting services to various corporate entities in the area of human resources and leadership assessment and development. Dr. Huck is one of the early pioneers in the assessment center methodology and has worked in the field since 1970.

8. In approximately 1972 and in subsequent years thereafter, Dr. Huck created, wrote, and copyrighted an original set of managerial and leadership assessment materials and processes (the "Leadership Lab" and "In Basket"), designed to measure managerial and leadership competencies and skills, and provides a process for managers to improve and track improvements in their leadership development. Because these materials and processes provide a unique system for organizing and evaluating the wide range of managerial and leadership behaviors, these assessment materials and processes are the cornerstone of Dr. Huck and HRI's consulting and coaching practice.

9. In San Diego in 2001, Plaintiff began his contractual relationship with Defendant whereby Plaintiff provided his human resources assessment and development consulting services to Defendants through 2005. These services were called the Leadership Lab Process. Through the Leadership Lab Process, Plaintiff and his staff would administer, evaluate, and consolidate results of 360 degree surveys (Management Practices Survey ©) and other assessment methodologies to Defendants' senior management personnel stationed in various Asian and Asia Pacific countries, Australia, and Middle Eastern countries, all comprising Pfizer's Asia Region. The results or data and interpretation of those evaluative surveys, which were strictly confidential, permitted Plaintiff and his staff to advise, counsel, and coach Defendant and its senior management personnel in the Asia Region on how to develop and enhance their management and leadership skills and efficiency. The Leadership Lab process also includes follow-up coaching, follow-up surveys, make-up programs, and corresponding assessment and consultation services, both on an individual and country-specific team basis. All of these services will collectively be referred to herein as the "Leadership Lab" Process.

10. Under their Contract, Dr. Huck also provided his "In Basket" (copyrighted Am-Pro Inc. under Innoative Management Systems) assessment and consulting services as a

separate selection instrument, behaviorally and objectively measuring 16 managerial and leadership competencies, such as problem analysis, organizing and planning, delegation, initiative, forcefulness, persuasiveness.  Assessments on the In Basket allow a company to increase the objectivity, reliability and validity of its selection process.

11. At all relevant times, Plaintiff's principal office and the offices of HRI's staff was located in San Diego, and Plaintiff administered HRI, the Leadership Lab Process and the In Basket through its San Diego Headquarters.  All evaluative reports for the Leadership Lab Process, the 360 degree survey, and the In-Basket were prepared in San Diego, California.  Further, Dr. Huck negotiated and entered the contractual relationship with Defendant in San Diego and hired additional staff in San Diego to specifically meet Defendant's needs.

12. When Plaintiff began his contractual relationship with Defendant, the compensation terms were that Defendant would pay Plaintiff a retainer of $15,000 per quarter—$60,000 per year—and Defendant would pay an agreed-to sum for each Leadership Lab Process, follow-up costs, plus the costs and expenses Plaintiff incurred in conducting the Leadership Lab Process, including, but not limited to, travel and living expenses.  Eventually, Defendant agreed to increase the retainer to $30,000 per quarter or $120,000 per year, plus the fixed price for each Leadership Lab Process conducted for management and leadership development of Defendants' key management personnel, and also a fixed fee for In Baskets when used as a selection tool.  The Leadership Lab Process requires re-surveys every two years for which Defendant agreed to continue and to pay.  Additionally, Defendant agreed to pay for re-surveys every two years, and make-up Leadership Labs Processes for all employees hired or promoted to a specific senior management level.

13. When Dr. Huck began this contractual relationship with Defendant in 2001, Dr. Huck was to provide or implement the Leadership Lab Process with two Southeast Asian countries, and shortly thereafter a Leadership Lab for all Asia Region Country Managers. Towards the end of 2001, Defendant requested that Dr. Huck implement these ongoing Leadership Lab Programs and Processes for the remaining Asia Region countries, eventually

all 11 Asia Region countries, Asia Region Country Managers, and Asia Region Director level staff and Pacific Countries, which Dr. Huck and his staff did. In addition, at the Defendant's request, the Leadership Lab Process was also cascaded down beyond the senior level for specific groups in several countries. Ultimately, Dr. Huck evaluated, assessed, advised, counseled, and coached over 150 Pfizer key managers on their personal development and leadership effectiveness.

14. As alleged in greater detail below, Defendants induced Plaintiff to provide the Leadership Lab Process and In Basket Assessments exclusively for Defendant, induced Plaintiff to hire additional staff to service Defendants' expanding needs, and induced Plaintiff to terminate his other consulting relationships and not pursue additional consulting relationships so that he could provide his services exclusively to Defendants to meet its demands. Defendant agreed to pay Plaintiff not only for the Leadership Labs and In Basket Assessments, but also for his and his staff's travel, costs of living, and other expenses required to carry out these services. Ultimately, Defendants refused, and continue to refuse, to pay Plaintiff for fees and services he rendered and expenses he and his company incurred. Furthermore, when Dr. Huck was working for Pfizer, he discovered what he believed to be Pfizer's violations of the Foreign Corrupt Practices Act and violations of Pfizer's own corporate compliance policies. Dr. Huck reported these alleged violations to Pfizer personnel. Dr. Huck is informed and believes that Pfizer terminated its relationship with Dr. Huck because he reported these alleged violations of the Foreign Corrupt Practices Act and Pfizer corporate compliance policies.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract Against all Defendants)

15. Plaintiff realleges and incorporates Paragraph 1 through 14, above.

16. Plaintiff and Defendant entered into a written contract whereby Defendant agreed to pay Plaintiff $30,000 per quarter—or $120,000 per year—as a retainer for Plaintiff to sustain the Leadership Lab Process with Defendants, plus pay for additional services and costs as alleged below. This Agreement is memorialized in several writings, including

without limitation, a June 18, 2003 e-mail between Dudley Schleier, Defendants' then-Asia Regional President and Dr. Huck, an August 3, 2004 letter agreement signed by Alan Taylor, Defendants' then-Asia Regional President, and an October 21, 2004 letter agreement also from Alan Taylor.  In addition to the $120,000 per year retainer, Defendant was obligated to pay an agreed sum for each Leadership Lab Process implemented, In Basket Assessments and reports, plus Plaintiff's expenses and costs related to these processes.  In the August 3, 2004 letter agreement, Alan Taylor—on behalf of Defendant—obligated Defendant to continue paying Plaintiff his $30,000 per quarter retainer plus agreed service costs for conducting and sustaining the Leadership Lab Processes as well as any follow-up services until such time as the parties executed a new written contact.  The parties never executed a new written contract.  In the October 21, 2004 letter agreement, Defendant Pfizer through Mr. Taylor confirmed its agreement that Dr. Huck would provide an additional two Leadership Labs and would conduct follow-up 360 degree surveys for all past Leadership Lab participants every two years.

17. Plaintiff has performed all duties, obligations and responsibilities on his part to be performed pursuant to the agreement, except those which have been excused, waived or otherwise released and those obligations which have not yet arisen.

18. In the past four years, Defendant has materially breached the terms of the agreement by failing and refusing, *inter alia*, to:  (1) pay Plaintiff's his $30,000 per quarter—$120,000 per year—retainer; (2) pay Plaintiff the agreed service costs for conducting the Leadership Lab Processes and In Basket Assessment; (3) pay Plaintiff's incurred expenses and costs; (4) schedule approved follow-up and make-up programs; and (5) to pay for approved follow-up and make-up programs and their attendant expenses and costs.

19. As a direct and proximate result of Defendant's breaches, Plaintiff has been damaged in an amount to be quantified and proven at or before trial, but exceeding $867,653.00.

20. As a further direct and proximate result of Defendant's breaches, Plaintiff has suffered, and will continue to suffer, consequential damages in an amount to be quantified

P:00429474.10:87016.002                              -6-                              08cv 1277 L (WVG)
FIRST AMENDED COMPLAINT

and proven at or before trial, but exceeding this Court's jurisdictional limit.

## SECOND CLAIM FOR RELIEF

**(Fraud and Deceit—Intentional Misrepresentation Against all Defendants)**

21. Plaintiff realleges and incorporates Paragraph 1 through 20, above.

22. Beginning in 2001, Defendant's then-Asia Regional President Dudley Schleier hired Dr. Huck to provide his Leadership Lab Process and In Basket Assessment to Defendant. Since the Leadership Lab programs and processes achieved great success and were widely recognized within Defendant's corporate structure, Mr. Schleier in November 2001 requested Dr. Huck and HRI devote their full resources to working for Defendant Pfizer, and implement the Leadership Lab process throughout the countries and Regional staff in the Pfizer's Asia Region. This meant that Dr. Huck and HRI had to terminate his/their existing consulting relationships with other clients and that Dr. Huck did not pursue any new consulting relationships with clients other than Defendant. On behalf of Defendant, then-Asia Regional President Dudley Schleier contracted with Dr. Huck to provide the Leadership Lab Process and In Basket Assessment to 11 countries located in Asia and Asia Pacific, Australia, and the Middle East, including regular market visits for sustainability, and providing 360 degree follow-up surveys every two years.

23. In 2004, Defendant promoted Dudley Schleier to a more senior position in New York, and Alan Taylor took over as his successor, as Asia Regional President. Acting on behalf of Defendant Pfizer, Mr. Taylor assured Dr. Huck both orally and in writing that Defendant would continue to employ him and HRI exclusively to provide his Leadership Lab Process and In Basket Assessment procedures, plus Leadership Lab make-up processes as required, and 360 degree follow-up surveys every two years consistent with the Leadership Lab and Defendant Pfizer's Talent Management Process. Mr. Taylor's representations on behalf of Defendant are evidenced by, *inter alia*, his August 3, 2004 letter agreement and October 21, 2004 letter agreement. In conjunction with these representations, Alan Taylor assigned Pfizer representatives Paul Thomas—who was the Human Resources Director for the Asia Region—and John Hoeft—who was the Director of

Sales Training, Field Force Effectiveness for Asia and Japan to meet with Dr. Huck to discuss the future of the Leadership Lab Process and In Basket Assessment at Pfizer.  During a March 24, 2004 meeting, Mr. Hoeft and Mr. Thomas and Mr. Taylor via telephone conferencing into this meeting, on behalf of Defendant Pfizer, represented to Dr. Huck that the Leadership Lab Process, follow-up 360 degree surveys to all past participants every two years, and In Basket Assessment would continue the same course of conduct as it had for the previous several years, that Pfizer would continue to pay Dr. Huck and HRI to provide his/their Leadership Lab programs and  services throughout the Asia Region, that the Leadership Lab process would be expanded and make-up Leadership Labs scheduled as needed, that Pfizer required Dr. Huck and HRI to devote his/their full attention, current resources, and additional HRI resources to administering the Leadership Lab Process and In Basket Assessment procedures to Pfizer's management personnel, and that Pfizer would continue to pay Dr. Huck his retainer, agreed service charges and costs including follow-up 360 degree surveys and make-up programs as required every two years, along with travel and cost-of-living expenses.  In a July 2004 conversation, Paul Thomas repeated these representations to Dr. Huck assured him that the Asia Region would continue to utilize the Leadership Lab Process and Pfizer would continue to pay Dr. Huck.  During a January 21, 2005 conversation, Paul Thomas, on behalf of Pfizer, again repeated the above representations and assured Dr. Huck that Pfizer would continue to pay him to implement his Leadership Lab Process and In Basket Assessment plus follow-up and make-up surveys and compensate him for attendant costs.  Paul Thomas, John Hoeft and Alan Taylor made other representations both oral and written to Dr. Huck along these same lines.  All of these representations will be collectively referred to as the "Representations."  Plaintiff is informed and believes that Alan Taylor, John Hoeft and Paul Thomas, were authorized by Pfizer to speak on its behalf, specifically to speak with Dr. Huck and to make the Representations, and did so with Pfizer's knowledge and ratification within the course and scope of their responsibilities at Pfizer.

24.     In fact, the Representations were false, and Dr. Huck only discovered their

1  falsity within the past three years.

2      25.    As alleged above, Defendants made oral and written Representations of
3  material fact to Dr. Huck during the course of their business relationship.

4      26.    These Representations were false.

5      27.    Defendant Pfizer, through its authorized representatives Alan Taylor, John
6  Hoeft and Paul Thomas, knew the Representations were false when they made them or
7  knew they were making those Representations recklessly, without knowing whether they
8  were true or false.

9      28.    Defendant Pfizer, through its authorized representatives Alan Taylor, John
10 Hoeft and Paul Thomas, made the Representations with an intent to defraud and deceive
11 Dr. Huck, that is, for the purposes of inducing Dr. Huck to rely on them and to act or to
12 refrain from acting in reliance on those Representations.

13     29.    Dr. Huck is informed and believes that the true facts were: Pfizer, through its
14 authorized representatives, had no intention of continuing Dr. Huck's Leadership Lab
15 Process, make-up Leadership Labs and re-surveys and In Basket Assessment; that Pfizer
16 through its authorized representatives had no intention of compensating Dr. Huck for the
17 agreed-upon Leadership Lab Process and In Basket Assessment both he actually provided
18 and Pfizer requested he provide; and Defendant Pfizer did not require Dr. Huck to devote
19 his full attention and resources to servicing Pfizer's needs to the exclusion of Dr. Huck's
20 existing and potential clients and business opportunities.

21     30.    Defendant Pfizer through its authorized representatives Alan Taylor, John
22 Hoeft and Paul Thomas knew that Dr. Huck did not know and could not reasonably
23 discover the true facts.

24     31.    At all times Defendant Pfizer, through it authorized representatives Alan
25 Taylor, John Hoeft and Paul Thomas, was making the Representations alleged, Dr. Huck was
26 unaware of the falsity of the Representations and believed them to be true.

27     32.    Dr. Huck relied on these Representations and was induced to, and in reliance
28 on, and as a result of the Representations did, expend substantial resources and sums of

1 money, including but not limited to hiring additional staff to service Defendant Pfizer's exclusive needs, provided Defendant Pfizer Leadership Lab Processes and In Basket Assessments, along with make-up and follow-up surveys, incurred extensive travel and accommodation expenses all in a sum exceeding $867,653.00.

33. Dr. Huck reasonably and justifiably relied on Defendant Pfizer's Representations of material fact when he provided his Leadership Lab Processes and In Basket Assessments, follow-up and make-up surveys, incurred travel and accommodation expenses, hired additional staff, terminated relationships with other existing clients and declined to pursue additional clients at Pfizer's insistence.

34. Had Dr. Huck known the true facts, he would not have continued to provide his Leadership Lab Processes and In Basket Assessments, follow-up and make-up surveys, incurred substantial travel and accommodation expense, hired additional staff, and declined to pursue other clients.

35. As a direct and proximate result of Defendant Pfizer's intentional Representations through its authorized representatives Alan Taylor, John Hoeft and Paul Thomas, Dr. Huck has suffered money damages, and will continue to suffer compensatory, general and special damages, including without limitation, an amount exceeding $867,653.00 subject to proof at trial.

36. Defendant Pfizer's conduct, through its authorized representatives Alan Taylor, John Hoeft and Paul Thomas, was intended to cause injury to Dr. Huck, and was oppressive, fraudulent and malicious conduct as defined in California Civil Code Section 3294, entitling Dr. Huck to exemplary and punitive damages according to proof.

### THIRD CLAIM FOR RELIEF
#### (Fraud and Deceit—Concealment Against all Defendants)

37. Plaintiff realleges and incorporates Paragraph 1 through 36, above.

38. As alleged above, Defendant Pfizer through its authorized representatives Alan Taylor, John Hoeft and Paul Thomas made oral and written Representations of material fact to Dr. Huck, including but not limited to, the Representations alleged above that Pfizer

would continue the Leadership Lab Processes and In Basket Assessments, the follow-up and make-up surveys, and would continue to compensate Dr. Huck for the same and his incurred costs and travel and living expenses.

39. Those Representations were false.

40. Defendant Pfizer through its authorized representatives Alan Taylor, John Hoeft and Paul Thomas knew the Representations were false when it made them, or knew it was making those Representations recklessly without knowing whether they were true or false.

41. Defendants Pfizer through its authorized representatives made the Representations when the intent to defraud and deceive Dr. Huck, that is, for the purposes of inducing Dr. Huck to rely upon them and to act or to refrain from acting in reliance on those Representations.

42. Dr. Huck is informed and believes that the true facts were: Pfizer, through its authorized representatives, had no intention of continuing Dr. Huck's Leadership Lab Process, make-up Leadership Labs and re-surveys and In Basket Assessment; that Pfizer through its authorized representatives had no intention of compensating Dr. Huck for the agreed-upon Leadership Lab Process and In Basket Assessment both he actually provided and Pfizer requested he provide; and Defendant Pfizer did not require Dr. Huck to devote his full attention and resources to servicing Pfizer's needs to the exclusion of Dr. Huck's existing and potential clients and business opportunities. Furthermore, Dr. Huck is informed and believes that Pfizer, through its authorized representatives, concealed from him its intention to terminate Pfizer's relationship with Dr. Huck because he reported to Pfizer personnel what he believed were violations by Pfizer of the Foreign Corrupt Practices Act and Pfizer's own corporate compliance policies.

43. Defendant Pfizer through its authorized representatives Alan Taylor, John Hoeft and Paul Thomas concealed the true facts from Dr. Huck and instead made the false Representations of facts alleged herein.

44. Defendant Pfizer through its authorized representatives Alan Taylor, John

Hoeft and Paul Thomas concealed the true facts with an intent to defraud and deceive Dr. Huck; that is, for the purpose of inducing Dr. Huck to rely upon them and to act or to refrain from acting in reliance on the Representations Defendant Pfizer's authorized representatives Alan Taylor, John Hoeft and Paul Thomas made, which were not consistent with the concealed, true facts.

45. At all times Defendant Pfizer through its authorized representatives Alan Taylor, John Hoeft and Paul Thomas was making the Representations alleged, Dr. Huck was unaware of the concealed, true facts.

46. Defendant Pfizer through its authorized representatives Alan Taylor, John Hoeft and Paul Thomas knew that Dr. Huck did not know and could not reasonably discover the concealed, true facts. Indeed, Dr. Huck only discovered the falsity of Defendant Pfizer's false Representations and the concealed, true facts within the past three years.

47. Because of Defendant Pfizer's possession of material facts which only it, through its authorized representatives Alan Taylor, John Hoeft and Paul Thomas, knew and which they knew that Dr. Huck did not know, and because of Defendant Pfizer's knowledge that these facts were material to Dr. Huck, Defendant Pfizer had a duty to disclose these facts to Dr. Huck in light of their ongoing business relationship.

48. In engaging in the conduct alleged, Defendant Pfizer through its authorized representatives Alan Taylor, John Hoeft and Paul Thomas further suppressed facts that it was bound to disclose while providing other "facts" to Dr. Huck that were likely to mislead Dr. Huck in light of the suppressed facts.

49. Defendant Pfizer owed Dr. Huck a duty of full disclosure, honesty, and candor, as well as the duty to exercise reasonable care and to make a reasonable and diligent investigation of the Representations its authorized representatives made to Dr. Huck.

50. Dr. Huck relied upon Defendant Pfizer's version of the "facts" which concealed the true facts and instead consisted of false representations of material fact. Dr. Huck was induced to, and in reliance thereon, expended substantial resources and sums

of money including without limitation, hiring additional staff to service Defendant Pfizer's exclusive needs, provided Defendant Pfizer Leadership Lab Processes and In Basket Assessments, along with make-up and follow-up surveys, incurred extensive travel and accommodation expenses all in a sum exceeding $867,653.00.

51. Had Dr. Huck known the true facts, he would not have continued to provide his Leadership Lab Processes and In Basket Assessments, follow-up and make-up surveys, incurred substantial travel and accommodation expense, hired additional staff, and declined to pursue other clients.

52. As a direct and proximate result of Defendant Pfizer's concealment of the true facts, through its authorized representatives Alan Taylor, John Hoeft and Paul Thomas, Dr. Huck has suffered, and will continue to suffer compensatory, general and special damages including without limitation, an amount exceeding $867,653.00 subject to proof at trial.

53. Defendant Pfizer's conduct, through its authorized representatives Alan Taylor, John Hoeft and Paul Thomas, was intended to cause injury to Dr. Huck, and was oppressive, fraudulent and malicious conduct as defined in California Civil Code Section 3294, entitling Dr. Huck to exemplary and punitive damages according to proof.

### FOURTH CLAIM FOR RELIEF

**(Fraud and Deceit—Negligent Misrepresentation Against all Defendants)**

54. Plaintiff realleges and incorporates Paragraph 1 through 53, above.

55. Defendant Pfizer through its authorized representatives Alan Taylor, John Hoeft and Paul Thomas made the Representations to Dr. Huck about existing material facts, set forth above.

56. Those Representations were false, but Dr. Huck only discovered their falsity within the past three years.

57. In making the Representations and omitting to stating material facts, Defendant Pfizer through its authorized representatives Alan Taylor, John Hoeft and Paul Thomas acted negligently in that it made those Representations without a reasonable ground for believing

them to be true, and did not exercise due care in investigating to determine the existence of the material facts admitted.

58. In engaging the conduct alleged, Defendant Pfizer through its authorized representatives Alan Taylor, John Hoeft and Paul Thomas made the Representations and statements of material fact and omitted to state material facts necessary to make statements that they made, in light of the circumstances in which they were made, not misleading, and necessary to be stated in an order that Dr. Huck would be informed of all material facts necessary for him to make an informed decision as to whether to continue providing Defendant Pfizer his Leadership Lab Process and In Basket Assessment, follow-up and make-up surveys, incurring costs including travel and living expenses, hiring additional staff, and foregoing other clients. Pfizer, through its authorized representatives Alan Taylor, John Hoeft and Paul Thomas made such Representations and statements with the intent to induce Dr. Huck to rely on them.

59. At the time of the Representations, statements, and omissions, Dr. Huck was unaware of the falsity and misleading nature of those representations and statements, and unaware that there had been omissions of material fact. Dr. Huck justifiably relied on those representations and statements, justifiably believed that there were no omissions of material facts, and reasonably and justifiably relied thereon. As a result, Dr. Huck was induced to, and in reliance thereon, expended substantial resources and sums of money including without limitation, hiring additional staff to service Defendant Pfizer's exclusive needs, provided Defendant Pfizer Leadership Lab Processes and In Basket Assessments, along with make-up and follow-up surveys, incurred extensive travel and accommodation expenses all in a sum exceeding $867,653.00.

60. As a direct and proximate result of Defendant Pfizer's misrepresentations and omissions alleged, Dr. Huck has suffered money damages and will continue to suffer compensatory, general and special damages, including without limitation, an amount exceeding $867,653.00 subject to proof at trial.

**FIFTH CLAIM FOR RELIEF**

**(Breach of Implied Covenant of Good Faith and Fair Dealing Against all Defendants)**

61. Plaintiff realleges and incorporates Paragraph 1 through 60, above.

62. Every contract includes an implied covenant of good faith and fair dealing. Defendant Pfizer, through its authorized representatives Alan Taylor, John Hoeft and Paul Thomas, breached the implied covenant of good faith and fair dealing by, *inter alia*, refusing to respond to Dr. Huck's proposals regarding the Leadership Lab Process and In Basket Assessment, refusing to participate in the necessary surveys involved in the Leadership Lab Process and In Basket Assessment, refusing to schedule approved Leadership Lab Processes and In Basket Assessments, delaying in responding to Dr. Huck's attempt to schedule approved Leadership Lab Processes and In Basket Assessments, failing to communicate with Dr. Huck, terminating Pfizer's relationship with Dr. Huck because he reported alleged violations by Pfizer of the Foreign Corrupt Practices Act and Pfizer's own corporate compliance policies, and generally sabotaging Dr. Huck's efforts to implement the Leadership Lab Processes and In Basket Assessment thereby frustrating the purpose of Dr. Huck's contract with Defendant Pfizer.

63. As a direct and proximate result of Defendant Pfizer's actions through its authorized representatives Alan Taylor, John Hoeft and Paul Thomas, Dr. Huck has been damaged in an amount to be quantified at or before trial but exceeding $867,653.00

**SIXTH CLAIM FOR RELIEF**

**(Unjust Enrichment Against All Defendants)**

64. Plaintiff realleges and incorporates by reference paragraphs 1 through 63, above.

65. Defendants enjoyed the benefits of Plaintiff's Leadership Lab Processes and In Basket Assessment without paying for those services and the attendant costs and expenses.

66. Plaintiff conferred benefits on Defendants when he provided the Leadership Labs, and Plaintiff did not intend to confer such benefits gratuitously.

67. Plaintiff has been damaged in the amount of the unpaid balance of

$867,653.00.

68. Plaintiff has been damaged in the principal sum $867,653.00 for Defendant's failure to pay the balance due for Plaintiff's consulting services, including the Leadership Labs, in a timely manner, plus interest at the highest rate allowed by law.

### SEVENTH CLAIM FOR RELIEF

**(Quantum Meruit—Against All Defendants)**

69. Plaintiff realleges and incorporates herein paragraphs 1 through 68, above.

70. Within the past four years, Plaintiff performed various consulting services, including the Leadership Labs, at the specific written and oral request of Defendants and DOES 1 through 50, and Defendants knew that these services were being provided by Plaintiff and promised to pay their reasonable value plus the attendant costs and expenses. Defendants accepted, used, and enjoyed the services provided by Plaintiff. Defendants thereby agreed to pay for the reasonable value of consulting services provided by Plaintiff.

71. Plaintiff has demanded payment from Defendants for the reasonable value of the consulting services, including the Leadership Labs and the attendant costs and expenses, provided by Plaintiff and his staff. Defendants have refused, and continue to refuse, Plaintiff's demand for payment.

72. The fair and reasonable value of the consulting services, including the Leadership Labs, provided by Plaintiff, together with costs, expenses and interest exceeds $867,653.00 and will be proven at or before trial.

73. As a direct and proximate result of Defendants refusal to pay, Plaintiff has been damaged in an amount exceeding $867,653.00, together with interest at the maximum allowable rate.

### EIGHTH CLAIM FOR RELIEF

**(Work, Labor, and Services Provided—Against All Defendants)**

74. Plaintiff realleges and incorporates Paragraph 1 through 73, above.

75. Within the last four years, Defendants became indebted to Plaintiff in the agreed sum of $867,653.00 for work, labor, and services performed by Plaintiff for

1  Defendants and at the special request of Defendants.

2      76.    Plaintiff has demanded that Defendants pay for the work, labor and services
3  Plaintiff provided, but Defendants refused, and continue to refuse.
4  As a direct and proximate result of Defendants refusal to pay, Plaintiff has been damaged in
5  an amount exceeding $867,653.00, together with interest at the maximum allowable rate.

6  **NINTH CLAIM FOR RELIEF**

7  **(Unfair Business Practices—Against all Defendants)**

8      77.    Plaintiff realleges and incorporates by reference paragraphs 1 through 76,
9  above.

10      78.    By its conduct, Defendant has engaged in unfair business practices in violation
11  of California Business & Professions Code Section 17200 *et seq.*

12      79.    Defendant's conduct proximately injured Plaintiff in an amount that is not
13  presently known but which will exceed $867,653.00, according to proof.

14      80.    As a direct and proximate result of Defendant's violation of California Business
15  & Professions Code Section 17200 *et seq.*, Plaintiff is entitled to restitutionary damages
16  according to proof, but at least in an amount that exceeds $867,653.00.

17  **PRAYER**

18      Wherefore, Plaintiff prays for judgment against Defendants, and each of them, as
19  follows:

20  **ON THE FIRST AND FIFTH CLAIMS FOR RELIEF AGAINST ALL DEFENDANTS**

21      1.    For general, special and consequential damages in an amount not less than
22  $867,653.00, plus interest, according to proof;

23  **ON THE SECOND, THIRD, AND FOURTH CLAIMS FOR RELIEF AGAINST ALL DEFENDANTS**
24  

25      1.    For the principal sum in an amount to be established at trial, but estimated at
26  this time to be in excess of $867,653.00;

27      2.    For punitive and exemplary damages according to proof;

28

**ON THE SIXTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS**

1. For the principal sum in an amount to be established at trial, but estimated at this time to be in excess of $867,653.00.

**ON THE SEVENTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS**

1. For compensation for the reasonable value of services performed in an amount not less than $867,653.00 subject to proof at trial.

**ON THE EIGHTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS**

1. For the principal sum in an amount to be established at trial, but estimated at this time to be in excess of $676,653.00;

**ON THE NINTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS**

1. For restitutionary damages in an amount to be proven, but exceeding $867,653.00.

**ON ALL CLAIMS FOR RELIEF AGAINST ALL DEFENDANTS**

1. For attorneys' fees and costs pursuant to contract and/or statute;
2. Interest thereon at the maximum rate allowed by law;
3. For costs of suit incurred herein;
4. For such other and further relief as the Court deems just and proper.

DATED: September 2, 2010            SOLOMON WARD SEIDENWURM & SMITH, LLP


By:   *s/Thomas F. Landers*
      THOMAS F. LANDERS
      L. GEOFFREY LEE
      Attorneys for Plaintiff

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury of all issues triable to a jury.

DATED: September 2, 2010            SOLOMON WARD SEIDENWURM & SMITH, LLP


By:   *s/Thomas F. Landers*
      THOMAS F. LANDERS
      L. GEOFFREY LEE
      Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I caused the **FIRST AMENDED COMPLAINT FOR: 1. BREACH OF CONTRACT; 2. FRAUD AND DECEIT—INTENTIONAL MISREPRESENTATION; 3. FRAUD AND DECEIT—CONCEALMENT; 4. FRAUD AND DECEIT—NEGLIGENT MISREPRESENTATION; 5. BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; 6. UNJUST ENRICHMENT; 7. QUANTUM MERUIT; 8. WORK, LABOR, AND SERVICES PROVIDED; AND 9. UNFAIR BUSINESS PRACTICES AND DEMAND FOR JURY TRIAL** to be served in the following manner:

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

Thomas P. Hanrahan, Esq.
Jennifer R. House, Esq.
Sidley Austin LLP
555 West Fifth Street , Suite 4000
Los Angeles, CA 90013
Telephone:  (213) 896-6665
Facsimile:   (213) 896-6600
E-mail:  thanrahan@sidley.com
E-mail: jhouse@sidley.com

Attorneys for Defendant Pfizer, Inc.

**Manual Notice List**

The following is the list of attorneys who are not on the list to receive e–mail notices for this case (who therefore require manual noticing).

No one.

           */s/ Thomas F. Landers*
           THOMAS F. LANDERS