1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JAMES R. HUCK dba HUMAN
RESOURCES INTERNATIONAL,

                        Plaintiff,

v.

PFIZER, INC.,

                        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

Civil No. 08cv1277-L(WVG)

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT**

        In this breach of contract and fraud action, Defendant filed a motion for summary judgment, which Plaintiff opposed.  For the reasons which follow, Defendant's motion is **GRANTED IN PART AND DENIED IN PART**.

        Plaintiff James R. Huck holds a Ph.D. in organizational psychology and provides consulting services to various corporate entities in the area of human resources and leadership assessment and development.  Plaintiff provided consulting services to Defendant in its Asia region from 2001 through 2005.  Defendant paid Plaintiff a quarterly retainer, a fixed fee for specific assessments and surveys, as well as Plaintiff's costs and expenses, including travel and living expenses.  During the course of the consulting relationship, Defendant's demand for Plaintiff's services increased.  According to Plaintiff, Defendant required him to provide his services exclusively to Defendant.  Plaintiff contends that Defendant promised him work into

08cv1277

2007, but instead terminated the relationship in August 2005.

Plaintiff filed a complaint in state court.  Defendant answered and removed the action to this court based on diversity jurisdiction pursuant to 28 U.S.C. Section 1332.  In his operative first amended complaint, Plaintiff stated claims for breach of contract, breach of the implied covenant of good faith and fair dealing, intentional misrepresentation, concealment, negligent misrepresentation, unjust enrichment, quantum meruit, unfair business practices pursuant to California Business and Professions Code Section 17200 *et seq.* ("UCL"), and for work, labor and services provided.  He seeks to recover in excess of $800,000 in damages.

Defendant moved for summary judgment with respect to several claims.  Rule 56 of Federal Rules of Civil Procedure empowers the court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986).  Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party's burden on summary judgment depends on whether it bears the burden of proof at trial with respect to the claim or defense at issue.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case."  *See C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  If the moving party does not bear the burden at trial, it can meet its burden on summary judgment by pointing out the absence of evidence with respect to any one element of the claim or defense.  *See Celotex*, 477 U.S. at 325.

If the movant meets its burden on summary judgment, the burden shifts to the nonmovant to show summary adjudication is not appropriate.  *Celotex*, 477 U.S. at 317, 324.  In this regard,

1    the nonmovant must "go beyond the pleadings" and rely on "evidentiary materials" such as his

2    "own affidavits, or . . . the depositions, answers to interrogatories, and admissions on file" to

3    designate specific facts in opposition to the summary judgment motion.  *Celotex*, 477 U.S. at 324

4    (internal quotation marks omitted).  These evidentiary materials must show that genuine factual

5    issues remain which "can be resolved only by a finder of fact because they may reasonably be

6    resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

7    The nonmovant does not meet this burden by showing "some metaphysical doubt as to material

8    facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

9         When ruling on a summary judgment motion, the nonmovant's evidence is to be believed,

10   and all justifiable inferences are to be drawn in his or its favor.  *Anderson*, 477 U.S. at 255.

11   Determinations regarding credibility, the weighing of evidence, and the drawing of legitimate

12   inferences are jury functions, and are not appropriate for resolution by the court on a summary

13   judgment motion.  *Id.*

14       Plaintiff claims breach of contract by relying on Defendant's August 3, 2004 letter and

15   October 21, 2004 memorandum.  Defendant argues that these documents are insufficient to

16   establish the existence of a written contract.  The court disagrees.  California substantive law

17   applies in this diversity action.  *See Intri-Plex Technol., Inc. v. Crest Group, Inc.*, 499 F.3d 1048,

18   1052 (9th Cir. 2007) & *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

19       Plaintiff relies in part on the August 3, 2004 letter from Alan Taylor, Pfizer's Regional

20   President.  The letter confirms Defendant's existing consulting relationship with Plaintiff and

21   states Defendant's "intent to formalize a contract for future provision of professional consulting

22   services."  (Def.'s Exh. 2 at 68.)  As explained in the letter, this was prompted by Defendant's

23   re-alignment of its internal accounting, whereby consulting services for the Asian markets would

24   be paid by the individual markets rather than Defendant's Head Office in New York or its

25   regional office in Hong Kong.  In addition, Defendant wanted to change its arrangement with

26   Plaintiff to be consistent with its other contracts with external consultants.  The letter confirmed

27   the contractual terms between the parties up to that point and in the interim period until the new

28   contract was executed.  Specifically, the letter provided:

> In light of the existing relationship between the Parties, we consider it fair and reasonable to provide [Plaintiff] with sufficient notice of our intention to formalize the new arrangement.  Hence, we aim to execute a new contract **no later** than 31 January 2005 ( in about 6 months' time).  In the interim period, Pfizer will continue to remunerate [Plaintiff] in accordance with the past costing agreement, which has included a retainer fee (US $30,000 per quarter) plus agreed service costs for the running of Leadership Labs . . . as well as any approved follow-up services.
>
> Please be advised that once the contract is signed by the Parties in late January 2005, a fixed fee for service arrangement will be determinative of all [Plaintiff's] remuneration for future services to be provided to the markets in Asia. . . .
>
> Should you have any queries regarding the above, please kindly refer them directly to Mr. Paul Thompson, Human Resources Director, Pfizer-Asia.

(Def.'s Exh. 2 at 68-69 (emphasis in original).)  The parties did not execute a new contract as contemplated in the August 3, 2004 letter.  Nevertheless, Defendant requested and Plaintiff performed services after the January 31, 2005 date.

Defendant argues that the August 3, 2004 letter is at most a letter of intent and not a written contract on which Plaintiff could base any of his claims.

> Whether a writing constitutes a final agreement or merely an agreement to make an agreement depends primarily upon the intention of the parties.  In the absence of ambiguity this must be determined by a construction of the instrument taken as a whole.  The objective intent as evidenced by the words of the instrument, not the parties' subjective intent, governs our interpretation. [¶]  Where the writing at issue shows no more than an intent to further reduce the informal writing to a more formal one the failure to follow it with a more formal writing does not negate the existence of the prior contract.  However, where the writing shows it was not intended to be binding until a formal written contract is executed, there is no contract.

*Harris v. Rudin, Richman & Appel*, 74 Cal. App. 4th 299, 307 (1999) (internal quotation marks and citations omitted).

The letter memorializes specific terms of the agreement between the parties which had been followed in the previous years and which were to govern "in the interim."  It also expresses an intent to change the terms in the future.  Without violating the parties' intent as evident in the document, the August 3, 2004 letter can be reasonably interpreted as affirming the existing contract between the parties, which was to continue "in the interim."  The remainder of the letter, which merely expresses an intent to change the current arrangement by a written contract executed at a later time, but does not specify the terms of the new arrangement, cannot be

08cv1277

1    reasonably interpreted as a contract, but merely a letter of intent.  To the extent Defendant argues

2    that Plaintiff's breach of contract claim should be dismissed because there was no written

3    contract at all, Defendant's motion is **DENIED**.

4         The parties disagree about the meaning of the term "in the interim period" as stated in the

5    letter.  Defendant argues that, at most, it entitled Plaintiff to continue the then-current payment

6    terms through January 31, 2005, when Defendant anticipated a new contract would be in place.

7    Plaintiff contends that it entitled him to continue the previous terms until a new contract was in

8    place.  The new contract contemplated in the letter was never executed.  (Huck Depo. at 180.)

9         "When a dispute arises over the meaning of contract language, the first question to be

10   decided is whether the language is reasonably susceptible to the interpretation urged by the

11   party."  *Oceanside 84, Ltd. v. Fidelity Fed. Bank*, 56 Cal. App. 4th 1441, 1448 (1997) (internal

12   quotation marks and citation omitted).  "If a contract is capable of two different reasonable

13   interpretations, the contract is ambiguous."  *Id.*  (internal quotation marks and citation omitted).

14   Based on the plain language of the letter, the letter is reasonably susceptible to the interpretations

15   offered by both parties.

16        "If the court decides the language is reasonably susceptible to the interpretation urged, the

17   court moves on the second question: what did the parties intend the language to mean?"  *Id*.  In

18   such cases, the court must "look to other objective manifestations of the parties' intent."  *Id*. at

19   1449.  Neither party has presented any evidence of what they intended the term to mean at the

20   time the letter was drafted.  In cases such as this, where there is no evidence that the parties

21   specifically agreed on, or even discussed, the meaning of the disputed term, the subsequent

22   course of conduct before any controversy arose, may be considered to attempt to ascertain the

23   parties' intent.  *Id*.

24        Defendant does not dispute that it was in charge of drafting the intended new contract for

25   execution no later than January 31, 2005.  (*See* Huck Decl. at 9.)  It is also undisputed that no

26   new contract was executed and that Defendant nevertheless requested and Plaintiff performed

27   services after January 31, 2005.  (*See id*. at 6-7.)  Defendant points to the parties' course of

28   dealing, particularly Plaintiff's invoices, to argue that Plaintiff did not expect to receive a

1   retainer or a housing allowance after January 31, 2005, and therefore, that "in the interim period"

2   referred to the time period expiring on January 31, 2005.

3        Plaintiff does not dispute that he did not send invoices for a retainer or housing allowance

4   for the period after January 31, 2005.  He explains, however, that Mr. Thompson, the Human

5   Resources Director referenced in the letter, requested him to submit proposals for service pricing

6   both with and without direct compensation for housing and a retainer.  (*Id*. at 15.)[1]  Based on this

7   request, Plaintiff did not know whether Defendant expected to receive an invoice for these fees

8   or whether they would be allocated to the service fee under the new contract.  (*Id*.; *see also* Huck

9   Depo. at 181 (expected that the retainer and housing allowance would be allocated to individual

10  countries).)  It can be reasonably inferred from Plaintiff's declaration and deposition testimony

11  that he expected to be compensated for his retainer and housing, either separately, under the pre-

12  existing arrangement, or by allocating these amounts to his service fees under the new contract.

13  Plaintiff's interpretation of the letter in this regard is not inconsistent with the express terms of

14  the letter.

15        Plaintiff provided sufficient evidence to counter Defendant's argument that the course of

16  conduct shows Plaintiff did not expect to be paid his retainer and housing allowance after

17  January 31, 2005.  Plaintiff has raised a genuine issue of material fact regarding the parties'

18  intent as to the meaning of the term "in the interim period."  To the extent Defendant seeks

19  summary adjudication of the issue whether Plaintiff was entitled under the August 3 letter to be

20  compensated for his quarterly retainer and housing allowance after January 31, 2005, its motion

21  is **DENIED**.

22        Defendant next disputes Plaintiff's claim that it made a commitment to use Plaintiff's

23  services through 2007.  For this proposition, Plaintiff relies on the October 21, 2004

24  memorandum from Mr. Taylor to certain Pfizer Asia managers and related e-mails.  (Def.'s Exh.

25  3 at 88.5-88.6.)  The memorandum provides in pertinent part as follows:

26        A regional requirement is that all Country Managers, Regional Staff, and CM-1's

27

28        [1]    Defendant filed voluminous evidentiary objections to Plaintiff's evidence.  Unless otherwise expressly stated herein, the objections are overruled.

have an up-to-date [Individual Development Plan ("IDP")] in place, approved by their direct supervisor.  Input for these IDP's comes through our 360-degree survey; the analysis, goal setting and action planning takes place through our Leadership Lab process.  We expect the 360 degree survey process to be conducted on an individual basis every two years . . ..

Those Country Managers, Regional Staff, and CM1's who have not previously attended a Leadership Lab will be scheduled for one of two "Regional Make-Up Labs," one for North Asia and one for South Asia, sometime before year end.

. . .[¶] I have asked Dr. Jim Huck to renew this survey process for Country Managers, Regional Managers, and CM-1's who have attended a Leadership Lab more than two years ago.  Jim and his staff will be working individually with these groups (Country Managers and Regional Staff) in order to get the re-survey process started.  Jim and Paul Thomas will be in contact with you to determine times for the two-day workshops required . . . in preparing an up-dated IDP.  Jim will be working on an individual basis with the five Country Managers due to participate in this re-survey.

(Def.'s Exh. 3 at 88.6.)

Defendant argues that the memorandum directed all of Plaintiff's services to take place by the end of 2004.  It relies on Mr. Thomas' e-mail communication to the employee groups referred to in the memorandum, which states,

Please take note of the attached message from Alan.  You will be contacted in due course by Jim Huck and/or myself for further information on either having to re-do a 360 (for those whose 360's was [sic] last done over 2 years ago) or both a 360 and attendance at a make-up Leadership Lab program (for those who are new to the process).  Ultimately, we should all have an updated Individual Development Plan (IDP) based on current 360 data, completed before the end of the calendar year.

(Def.'s Exh. 3 at 88.5.)

On the other hand, Plaintiff points to the language of the memorandum, which states that the process is expected to take place every two years.  He understood the memorandum to direct certain groups of Defendant's employees to undergo a survey process every two years, starting with a Leadership Lab and a re-survey after two years.  According to Plaintiff, a "Leadership Lab cycle" as described in the memorandum takes four years.  (Huck Decl. at 9.)  Plaintiff argues that this was also consistent with the representations Messrs. Taylor and Thomas made to him in March 2004, July 2004 and January 2005.  (*Id.* at 10.)  Because the Leadership Lab process was proprietary to Plaintiff (*id.* at 2), the trier of fact could reasonably infer that the memorandum contemplated that Plaintiff, rather than a new consultant, was to perform the

1    Leadership Lab process as described in the memorandum.

2          Plaintiff's evidence is sufficient to raise a genuine issue whether the parties agreed that

3    the consulting relationship would continue for another Leadership Lab "cycle" into 2007.  To the

4    extent Defendant seeks summary adjudication of this issue, its motion is **DENIED**.

5          Defendant also disputes Plaintiff's claim that it breached the implied covenant of good

6    faith and fair dealing when the consulting relationship was terminated without good cause.  It is

7    undisputed that the contract between the parties did not expressly address termination.

8          Defendant maintains that Plaintiff's claim must fail because Plaintiff admitted he was

9    terminable at-will.  Considering Plaintiff's testimony, as the court must when ruling on a

10   summary judgment motion, by drawing all justifiable inferences in his favor, *see Anderson*, 477

11   U.S. at 255, the testimony is not specific enough to constitute the admission Defendant makes it

12   out to be.  Plaintiff testified that he was an independent contractor (Huck Depo. at 27-28) and

13   did not deny that, "if people in position of authority at Pfizer wanted to eliminate [his] role, the

14   company could do that at any time" (*id*. at 329-30).  Defendant did not cite any testimony where

15   Plaintiff was asked whether the parties agreed the consulting relationship was terminable at will

16   or where he expressly stated that it was terminable at will.  Although the inference Defendant

17   draws from Plaintiff's testimony is not unreasonable, it is not the only possible reasonable

18   inference.  Plaintiff's testimony can reasonably be understood in more general terms, for

19   example, it can be understood as a statement that if the people in position of authority decided to

20   eliminate his role, they had the power to do so, whether rightly or wrongly.

21         In addition, Plaintiff points to the October 21, 2004 memorandum to show that, at the

22   very least, the parties agreed the consulting relationship would continue until the services

23   specified therein were performed, and argues that termination for cause during that time was

24   implied.

25         In every contract or agreement there is an implied promise of good faith and fair
           dealing.  This means that each party will not do anything to unfairly interfere with
26         the rights of any other party to receive the benefits of the contract; however, the
           implied promise of good faith and fair dealing cannot create obligations that are
27         inconsistent with the terms of the contract.

28   Jud. Council of Cal., Civ. Jury Instruction ("CACI") 325 (2011).  Termination for cause while

8

1   Plaintiff was performing the requested services is not inconsistent with the August 3, 2004 letter

2   or the October 21, 2004 memorandum.  Defendant does not dispute that the parties present

3   conflicting theories and evidence regarding the cause for terminating the consulting relationship.

4   Accordingly, Defendant's motion for summary judgment on the implied covenant of good faith

5   and fair dealing is **DENIED**.

6         Defendant next argues that Plaintiff cannot recover some of the damages he requests

7   because the damages were compromised between the parties and Defendant paid the

8   compromised amount.  Defendant bases this argument on the doctrine of accord and satisfaction.

9   This is a defense on which Defendant bears the burden of proof.  *See Ladd v. Warner Bros.*

10  *Entm't, Inc.*, 184 Cal. App. 4th 1298, 1309 & n.8 (2010).

11        Under California law, an accord and satisfaction is the "substitution of a new agreement

12  for and in satisfaction of a preexisting agreement between the same parties."  *Red Alarm, Inc. v.*

13  *Waycrosse, Inc.*, 47 F.3d 999, 1002 (9th Cir. 1995) (internal quotation marks and citation

14  omitted).  "[B]efore an accord and satisfaction can be fully effectuated, the offer of compromise

15  must be accepted by the offeree."  *Id.* (citation omitted).  "[T]he acceptance of the check or draft

16  does not constitute an accord and satisfaction if the creditor protests against accepting the tender

17  in full payment by striking out or otherwise deleting that notation or if the acceptance of the

18  check or draft was inadvertent or without knowledge of the notation."  Cal. Civ. Code § 1526(a).

19  Plaintiff disputes that he accepted Defendant's offer of compromise.

20        Plaintiff submitted an invoice for $172,485.23 for services rendered through January

21  2005 and included bank transfer information for payment.  (Def.'s Exh. 2 at 76-77.)  Defendant

22  responded with a letter from the Senior Corporate Counsel – Pfizer, Inc. – PGP Asia, offering to

23  pay

24      $74,970.56 in full and final settlement of all outstanding payments due [Plaintiff]
        for services rendered between 2003 to present [*sic*]. . . . [¶]  Payment will be made

25      within 5 working days of receipt by me of the duplicate version of the letter which
        I would ask you to sign as acknowledgment of the terms of this letter and return to

26      me . . . .

27  (*Id.* at 79.)  Plaintiff did not sign a duplicate of Defendant's letter to acknowledge Defendant's

28  offer, but responded with a letter dated December 5, 2006 disagreeing with Defendant's analysis

1  of the amounts due, and stating that "[s]ince [Defendant] has opted to approach this as a legal

2  matter, I will need to seek my own legal counsel as to how to proceed." (*Id.* at 80.)

3      Defendant's corporate counsel responded on December 19, 2006 stating, "please take

4  whatever time you need to take any correct advice you deem prudent." (*Id.* at 81.)  He further

5  stated that Defendant was able to locate invoices for some additional expenses, which had not

6  been included in Defendant's previous offer.  (*Id.*)  Specifically, the letter stated that

7      we do now have these invoices and . . . these expenses will be paid immediately.
   Further more [*sic*] in order to close this matter out speedily, I am going to forward
8      to your nominated account a payment of $79,970.56 . . . as a full and final payment
   in this matter. . . . [¶] This payment will be scheduled for Wednesday, 20th
9      December [*sic*] and will take three to four working days to clear into the account.
   [¶] . . . I do formally ask you to acknowledge receipt of the payment made by
10     signing the duplicate of this letter and returning it to me at the address above.
   However, even in the absence of any such formal acknowledgment Pfizer will be
11     making a note on its files of the payment of this amount to this account and please
   be informed that Pfizer considers the matter closed.
12

13 (*Id.* at 81-82.)  Plaintiff did not sign a duplicate of Defendant's letter or otherwise acknowledge

14 receipt of payment, but Defendant nevertheless wire transferred the payment to Plaintiff's

15 account.  (Huck Decl. at 16.)  "There was no notation on the wire transfer to the effect of 'final

16 payment'" and Plaintiff did not consider the payment as payment in full.  (*Id.*)  Because the

17 partial payment was wire-transferred directly to Plaintiff's account, and therefore did not require

18 any act on Plaintiff's part to accept payment, this is not the typical situation where a creditor

19 deposits a check with a notation that it constitutes payment in full.  Plaintiff contends that he did

20 not agree to accept a partial payment as a compromise of the full amount he contends is owing.

21 (*Id.*)  This can be reasonably inferred from his December 5, 2006 letter.  Furthermore,

22 Defendant's December 19, 2006 letter does not unambiguously state that the partial payment

23 would constitute a payment in full even if Plaintiff failed to return a signed duplicate.[2]  Based on

24 _____

25      [2]  Although the letter stated that the payment was made "as a full and final payment
   in this matter," it also requested Plaintiff's acknowledgment by returning a signed duplicate of
26 the letter.  The consequence of failure to return a signed duplicate was that "Pfizer will be
   making a note on its files of the payment of this amount to this account and . . . consider[] the
27 matter closed."  What this means is not explained.  Defendant's argument is based on the
   premise that the payment was made in full regardless of Plaintiff's acknowledgment.  This
28 renders the request for acknowledgment meaningless.  On the other hand, the request has
   meaning if it is required show that Plaintiff accepted Defendant's offer of partial payment as

10                                                                08cv1277

1   the foregoing, Plaintiff raised a genuine issue whether he accepted Defendant's offer of

2   compromise.  Defendant's motion for summary adjudication of accord and satisfaction is

3   therefore **DENIED**.

4          Defendant also seeks summary adjudication of several components of Plaintiff's breach

5   of contract damages.  With respect to $93,457.41 in other allegedly unpaid services and

6   expenses, Defendant argues that they should be summarily adjudicated because there is no

7   support for them.  Defendant relies on the testimony of Plaintiff's accounting expert Douglas R.

8   Anderson, CPA for this proposition.  (Def.'s Exh. 4.)  Mr. Anderson testified that although he

9   did not see invoices in support of his damages calculation, he relied on information he received

10  from Plaintiff.  (Anderson Depo. at 140-50.)  According to Plaintiff, he provided the services for

11  which he is seeking payment and which are included in his expert's report.  (Huck Decl. at 16.)

12  Experts may rely on the information provided him by Plaintiff.  *See* Fed. R. Evid. 703.

13  Defendant's argument that these items of damages should be summarily adjudicated in its favor

14  is rejected.

15         Defendant also contends that some of the services which are included in the requested

16  amount were covered by Plaintiff's retainer, and therefore cannot be separately recovered.  As

17  discussed above, Plaintiff raised a genuine issue whether he was entitled to a retainer after

18  January 2005; accordingly, there is also a genuine issue whether he is entitled to recover for such

19  services.

20         Last, Defendant argues that the amounts Plaintiff seeks to recover in connection with the

21  development of a community Mental Health Clinic to provide support in the aftermath of the

22  Thailand tsunami in late 2004 were for charity work on behalf of Defendant.  Plaintiff claims

23  that the work was not charity, but was performed pursuant to directions from Defendant's

24  employees.  (Huck Decl. at 15.)  Accordingly, there is a genuine issue whether Plaintiff is

25  entitled to compensation from Defendant for this work.  To the extent Defendant seeks summary

26  adjudication of Plaintiff's claims for contract damages, its motion is **DENIED**.

27  _____

28  payment in full.  At best, the December 19, 2006 letter is ambiguous regarding the significance
    of Plaintiff's acknowledgment.

08cv1277

1    Defendant also seeks summary adjudication of Plaintiff's fraud claims.  Plaintiff presents

2    two alternative theories, one based on intentional misrepresentations and the other on

3    concealment.  (Opp'n at 20-21.)  To prevail on either theory, Plaintiff has the burden of proving

4    intent to defraud.  *See Lazar v. Super. Ct. (Rykoff-Sexton, Inc.)*, 12 Cal.4th 631, 638 (1996).

5    Defendant argues in part that Plaintiff cannot present any evidence to raise a genuine issue of

6    fact regarding this element.

7    Plaintiff initially argues that Defendant did not meet its burden as the moving party on

8    summary judgment because Defendant's evidence was insufficient to show that there is no

9    genuine issue of material fact.  (*See* Opp'n at 18-19.)  Plaintiff misconstrues Defendant's burden

10   with respect to this claim.  When, as here, the nonmoving party has the burden of proof at trial,

11   the moving party need only point out that there is an absence of evidence with respect to any one

12   element of the claim.  *Celotex*, 477 U.S. at 325.  This can be accomplished by "pointing out

13   through argument the absence of evidence to support plaintiff's claim.  *Fairbank v. Wunderman*

14   *Cato Johnson*, 212 F.3d 528, 532 (9th Cir.2000); *see also Devereaux v. Abbey*, 263 F.3d 1070,

15   1076 (9th Cir. 2001).  Defendant has met its burden as the moving party so as to shift the burden

16   on Plaintiff.  Moreover, Defendant's argument regarding the intentional misrepresentation claim

17   is not as limited as Plaintiff paints it to be.  (*See* Opp'n at 18-19.)  Among other things,

18   Defendant expressly argues that Plaintiff cannot show that intent to defraud was present when

19   Defendant's representatives allegedly made their misrepresentations.  (Def.'s Mot. at 18.)

20   California law recognizes fraud claims based on failure to perform a promise, if the

21   promise was made with intent not to perform.  Cal. Civ. Code § 1710(4); *Tenzer v. Superscope,*

22   *Inc.*, 39 Cal.3d 18, 28-31 (1985) (a real estate broker can state a claim for fraud based on the

23   client's failure to perform its promise to pay commission).  Plaintiff contends, among other

24   things, that Mr. Thomas represented to him in March 2004, July 2004 and January 2005 that

25   Defendant would continue to retain Plaintiff for another "cycle" of the Leadership Lab process.

26   (Huck Decl. at 10.)  Plaintiff maintains that this promise was breached when his consulting

27   services were terminated in late 2005.  (*Id*. at 12.)  He argues that the representations were

28   fraudulently made.

08cv1277

1        To prove that the representations were made with intent to defraud, Plaintiff must show

2    more than Defendant's ultimate failure to perform the promise.  *See Tenzer*, 39 Cal.3d at 30-31.

3    Plaintiff relies in part on a document entitled Paul Thomas – 2004 Objectives.  (Pl.'s Exh. 8.)

4    Defendant objected to this exhibit as unauthenticated and lacking foundation.  (Evidentiary

5    Objections at 22.)  Plaintiff did not respond to the objections.  Plaintiff, as the party seeking

6    admission of the document, bears the burden to show it is admissible.  *In re Oracle Corp. Sec.*

7    *Litig.*, 627 F.3d 376, 385 (9th Cir. 2010).  The only information about the document offered by

8    Plaintiff is that the document was produced by Defendant in discovery.[3]  (Landers Decl. at 2.)

9    This is insufficient to lay foundation or authenticate it.  Defendant's objections are therefore

10   sustained.

11       The second piece of evidence Plaintiff relies on is the testimony of the then-Defendant's

12   Country Manager for Thailand, Amal Naj.  (Opp'n at 19-20.)  Mr. Naj testified that at some time

13   prior to the termination of Plaintiff's consulting services, he became aware, based on observation

14   of various communications from Mr. Thomas' department, that they wanted to replace Plaintiff

15   and his Leadership Lab process.  (Naj Depo. at 123-26.)  Mr. Naj, however, did not testify as to

16   any facts to support an inference that the movement to replace Plaintiff started at any time before

17   Mr. Thomas' last representation to Plaintiff in January 2005.  This testimony is therefore

18   insufficient to raise a genuine issue whether Mr. Thomas made his representations to Plaintiff

19   with intent to defraud.  Because Plaintiff has not met his burden to raise a genuine issue of fact

20   with respect to the intent element of his intentional misrepresentation claim, Defendant's motion

21   for summary adjudication of this claim is **GRANTED**.

22       Plaintiff's alternative fraud claim is that although the representations were true when

23   made, Defendant later concealed from Plaintiff that the representations were no longer true.

24   Defendant argues in part that Plaintiff cannot show intent to defraud in relation to his

25   concealment claim.

26       Like the promissory fraud theory, concealment requires intent to defraud when the

27   _____

28       [3]     Although Plaintiff refers to this document in his declaration, he does not attempt to
     authenticate it or provide foundation.  (*See* Huck Decl. at 13.)

                                         13

material fact was concealed.  *See* CACI 1901 (defendant intended to deceive plaintiff by concealing the fact).  Plaintiff's theory of concealment is that shortly after he reported to Messrs. Thomas and Naj that he believed Defendant was violating the Foreign Corrupt Practices Act and its own corporate compliance policies, Defendant decided to no longer use Plaintiff's services and concealed this from him with intent to defraud.  (Opp'n at 20-21.)  Although it appears from the context that Plaintiff made his reports in or prior to May 2005, Plaintiff is not more specific regarding the time frame when he reported the alleged violations.  (*See* Huck Decl. at 12.)  Because the defendant must have the requisite intent at the time of concealment, the time when Plaintiff made his reports is relevant to evaluating the evidence of intent.

Moreover, Plaintiff acknowledges that Mr. Thomas ceased communicating with him shortly after the report, including for scheduling any further Leadership Labs.  (*Id*.)  Defendant informed Plaintiff in May 2005 that Defendant would not go forward with Leadership Labs for the Asia Country Managers and the Asia region staff.  (*Id*.)  Although Plaintiff continued until late 2005 to provide Leadership Labs to lower level executives in individual Asian countries (*id*.), it appears that Plaintiff was put on notice as early as May 2005 that the consulting relationship between Plaintiff and Defendant had changed.  This evidence negates an inference of intent to defraud Plaintiff by concealing that Defendant no longer intended to use his services.

To the extent Plaintiff relies on August 2005 e-mail exchanges to show intent to defraud, they are insufficient to support an inference.  (Landers Decl. Exh. 3-5.)  The e-mail exchanges show that in August 2005 Defendants' representatives intended to terminate all of Plaintiff's remaining services.  Given that the e-mails were exchanged months after Plaintiff reported the suspected violations, that some of Plaintiff's services were terminated already in May 2005, and that the consulting relationship was terminated shortly after August 2005, the e-mails are insufficient to support an inference that, as Plaintiff contends, shortly after his reports, Defendant's representatives failed to disclose their intent no longer to use Plaintiff's services, and that alleged failure to disclose was based on their intent to defraud Plaintiff.

Based in the foregoing, Plaintiff failed to raise a genuine issue that Defendant's representatives concealed material facts from him with intent to defraud him.  To the extent

08cv1277

1   Defendant moves for summary adjudication of the concealment claim, its motion is **GRANTED**.

2   Defendant next argues that Plaintiff's UCL claim should be dismissed because none of

3   damages Plaintiff seeks are recoverable under the statute.  Plaintiff seeks damages which include

4   payment for services he performed and for which he has not been paid.

5   The monetary remedies available to individual plaintiffs for unfair competition are limited

6   to restitution and injunctive relief.  *Cel-Tech Cmmc'n*, 20 Cal.4th 163, 179 (1999); *Madrid v.*

7   *Perot Sys. Corp.*, 130 Cal. App. 4th 440, 452 (2005), citing Cal. Bus. & Prof. Code §§ 17203,

8   17206.  "The concept of restoration or restitution, as used in the UCL, is not limited only to the

9   return of money or property that was once in the possession of that person.  Instead, restitution is

10   broad enough to allow a plaintiff to recover money or property in which he or she has a vested

11   interest." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1149 (2003) (internal

12   quotation marks and citation omitted); *Juarez v. Arcadia Fin., Ltd.*, 152 Cal. App. 4th 889, 914-

13   18 (2007) and cases discussed therein.  For example, in the employment context, payment of

14   wages unlawfully withheld from an employee are recoverable under the UCL.  *Cortez v.*

15   *Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 177-78 (2000).

16   Accordingly, Defendant's argument that the UCL claim should be dismissed because

17   Plaintiff is not seeking recoverable damages is rejected.  As discussed in the context of breach of

18   contract damages, there is a genuine issue regarding Plaintiff's claim for services he performed

19   and for which he had not been paid.  To the extent Defendant's summary judgment motion is

20   based on recoverable damages under the UCL, it is **DENIED**.

21   Finally, Defendant raises two arguments solely in footnotes.  (*See* Def.'s Mot. at 1 n.1 &

22   25 n.10.)  Neither argument is fully articulated or properly raised.  Accordingly these arguments

23   are rejected without prejudice.

24   / / / / /

25   / / / / /

26   / / / / /

27   / / / / /

28   / / / / /

08cv1277

1    For the reasons stated above, Defendant's motion for summary judgment is **GRANTED**
2    with respect to the intentional misrepresentation and concealment claims and **DENIED** in all
3    other respects.

4    **IT IS SO ORDERED**.

5

6    DATED:  July 25, 2011

7    _____
     M. James Lorenz
8    United States District Court Judge

9

     COPY TO:
10
     HON. WILLIAM V. GALLO
11   UNITED STATES MAGISTRATE JUDGE

12   ALL PARTIES/COUNSEL

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

08cv1277